**Carl LWELLYN, Appellant,**

v.

**John HARMON, Appellee.**

**Beckham WILLIAMSON, Appellant,**

v.

**John HARMON, Appellee.**

Court of Appeals of Kentucky.

Dec. 16, 1955.

John M. Berry and D. K. Floyd, New Castle, for appellant.

J. F. Thomas, New Castle, for appellee.

CULLEN, Commissioner.

Carl Lwellyn and Beckham Williamson brought actions against their former employer, John Harmon, to recover the difference between the wages actually paid to them and the minimum wages claimed to be due in accordance with KRS 337.510 to 337.550, for work on three public road construction projects during the years 1949 and 1950. The actions were tried together and the jury returned a verdict denying any recovery. Lwellyn and Williamson appeal, contending that under any view of the evidence they were entitled to some recovery and that the instructions were erroneous in permitting the jury to find that there had been no underpayment of wages.

The claims of Lwellyn and Williamson were predicated on the proposition that they were employed, respectively, as bull dozer operator and road scraper operator, and that under Harmon's construction contract he was required to pay them a minimum wage of $2.15 per hour for a regular 40-hour week, and $3.22 for each hour in excess of 40 in any week. Actually, Harmon had paid them each a flat wage of $50 per week.

Although there is some slight conflict in the evidence as to the dates, it is reasonably certain that the two men commenced work on the road projects in July 1949 and continued until the projects were shut down for the winter, which was sometime between November 15 and December 1, 1949. The road work commenced again around April 1, 1950 and continued until about the middle of August 1950. During the winter months, when the road projects were shut down, the men worked on machinery in Harmon's garage and did other miscellaneous work for Harmon. During all the period from July 1949 to August 1950 Harmon paid them a flat wage of $50 per week, except for deductions made in a few weeks in which the men were off one or two days for personal reasons. The men do not claim the statutory minimum wages for the period during the winter when the road projects were shut down,

but only for the weeks they actually were working on the roads.

■ The evidence is overwhelming that when the road projects were being carried on, the functions of Lwellyn and Williamson were those of bull dozer operator and road scraper operator. The testimony of the two men that their work consisted almost exclusively of the operation of such equipment was supported not only by a number of their fellow workers, but by the job foreman, the bookkeeper, and Harmon's son. None of these witnesses ever saw the two men do any work on the road jobs other than operate the equipment, except for some very incidental manual labor. Harmon endeavored to testify that the men often performed routine manual labor, but a fair interpretation of his testimony is that any manual labor they performed was only when some obstacle momentarily delayed operation of the equipment. We think it is beyond question that when the road work was going on the two men were entitled to the wages specified for equipment operators.

The evidence as to the number of weeks during which the road work was carried on is somewhat conflicting, but it is reasonably certain that the number was at least 37. Williamson testified that he worked on the roads a total of 40 weeks, and Lwellyn's testimony was that he worked a total of 51 weeks. Harmon's bookkeeper, testifying for the defense, said that his records showed that Williamson had worked on the roads 49 weeks, and Lwellyn 37 weeks. Other evidence tended to fix the number of weeks around 38 or 40. There was some testimony about the road projects being shut down during bad weather, but it is apparent that this had reference to the period from December 1949 through March 1950, when no attempt was made to work on the roads.

As concerns the number of hours worked, the evidence for the plaintiffs is not as clear cut as might be desired. This seems to be due in large part to the fact that the plaintiffs are illiterate men who kept no records other than the stubs that accompanied their wage checks. The plaintiffs did testify that the normal work week was 55 hours, and they were corroborated in this by a number of their fellow workers. Harmon himself, and his bookkeeper, stated that they "aimed" to work 55 hours per week, and did so when the weather was good. However, Harmon testified, in generalities, that the weather was bad most of the time and the work was shut down often because of bad weather. The two plaintiffs testified that there were only a comparatively few days when bad weather stopped work on the roads, one of them estimating that the number of such days did not exceed ten.

Harmon's current records did not show the number of hours worked, although he attempted to state the number of hours on the basis of some computations made by him in preparation for the trial. These computations were predicated on some records as to the number of hours some other workers had spent on the road jobs. Harmon's estimate for Lwellyn and Williamson was 1070 hours each. To accept this estimate, one would be required to believe that during the minimum of 37 weeks the road projects were being carried on, the work was stopped by bad weather at least half of the time.

Even if Harmon's estimate of the number of hours should be accepted, the plaintiffs would be entitled to some recovery, because that number, multiplied by the minimum wage of $2.15 per hour, would amount to more than was paid to the plaintiffs.

■ The instructions given by the trial court were so phrased as to require the jury to pass upon the question of whether or not there had been an underpayment of wages. This was error, because even taking the evidence of the defendant at its face value there was some underpayment. We have no doubt but that the jury, under these instructions, considered the fact that the plaintiffs had agreed to work for a flat wage of $50 a week, to be paid to them even during the slack winter season when the road projects were shut down, and concluded that averaging out the whole year

the wages were adequate. This the jury was not entitled to do. The plaintiffs were entitled to the designated minimum wages for the time they were working on the road jobs, and the fact that their employer paid them wages during the off season, which he might not have done had he been paying them the minimum hourly wages during the road work, is not to be considered. See Travis v. Ray, D.C., 41 F.Supp. 6.

 The plaintiffs offered instructions in the form of interrogatories, with a statement of duties. These would have asked the jury to find, simply, how many hours each of the plaintiffs worked as an equipment operator on the road projects at the rate of 40 hours per week, and how many in excess of 40 hours per week. We think this kind of instruction was best adapted to the issues and proof in these cases. The proof for the plaintiffs, although not fixing the number of hours with exactness, was sufficient to justify a finding that the men had worked on the roads for at least 37 weeks, and that with the exception of not more than ten days when bad weather stopped the work, they worked 55 hours per week. We think it would substantially nullify the minimum wage statute to require laborers, who often are illiterate and inexperienced in the keeping of records, to show with absolute certainty the number of hours worked in each individual week. Some latitude should be allowed. Admittedly, the jury will not be able to reach a mathematically exact verdict, but even if every doubt is resolved against the plaintiffs their proof warrants more than a nominal recovery.

Upon another trial, the court should give interrogatory instructions substantially in the form offered by the plaintiffs. Also, the court should instruct that the fact that the plaintiffs agreed to work for a flat rate of $50 per week, and were paid this rate when they were not working on the roads, is not to be considered in determining the amount of wages that should have been paid.

The judgment is reversed, for proceedings in conformity with this opinion.